IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                                      NO. 16-CR-928 WJ

CANDELARIO AYALA,

    Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING UNITED STATES' REQUEST FOR AN UPWARD VARIANCE

THIS MATTER is before the Court on the United States of America's Sentencing Memorandum filed on December 1, 2016 (**Doc. 32**), in which the government seeks an upward variance to a sentence of imprisonment of 96 months. Having considered all the factual and legal matters presented in the extensive record before this Court, as well as the arguments presented at the hearing on June 5, 2017, this Court has determined that an upward variance from the Sentencing Guidelines is justified; however, the Court will hear any final sentencing arguments from counsel at the sentencing hearing which the Court anticipates setting in Las Cruces when the Court travels there the week of August 21, 2017. The Court notes that the United States is requesting that the Defendant be sentenced to a term of 96 months' imprisonment, which would constitute an upward variance of 25 months above the high end of Defendant's sentencing guideline range of 57 to 71 months.

## BACKGROUND

On March 14, 2016, Defendant Candelario Ayala, Jr. pled guilty to a one-count Information, charging Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1), 18 U.S.C. § 924(a)(2). Subsequently, the probation office prepared Defendant's presentence report

("PSR"). The PSR determined Defendant's base offense level to be 24. *See* United States Sentencing Guidelines Manual ("Guidelines") § 2K2.1. Based on the total offense level of 21[1] and a criminal history category of IV, the PSR set forth Defendant's advisory Guidelines imprisonment range at 57 to 71 months.

The government alleges that the following circumstances warrant an upward variance: On October 23, 2015, Defendant kidnapped his ex-girlfriend Lezlie Monreal[2] at gunpoint, and during this event Defendant fired one round from his gun into the floor of Ms. Monreal's residence. This incident started the investigation that resulted in Defendant being charged for being a felon in possession of a firearm.

At the hearing on June 5, 2017, the parties fleshed out the circumstances surrounding the October 23, 2015 incident. The government claims after Defendant forced Ms. Monreal into his vehicle, a maroon Suburban, he drove her at gunpoint to a trailer in Canutillo, Texas where he sexually assaulted her. The government called the case agent, Special Agent Bryce Fankhauser of the FBI, to testify at length as to what he had learned from Ms. Monreal and other witnesses. Special Agent Fankhauser explained that on October 23, 2015, Ms. Monreal went to her mother Norma Avalos' home, located at 916 McKinley in Anthony, New Mexico (the "McKinley Residence").[3] Defendant arrived at the residence with a gun shouting Ms. Monreal's name, pushed his way into the residence, and shot a round into the floor. Special Agent Fankhauser testified that the spent shell casing was never located because it hit a steel beam that runs laterally underneath the home and shattered into numerous pieces. There was a significant amount of debris and trash underneath the residence that would have concealed the pieces of the

---

[1] Defendant received a three level reduction from his base offense level of 24 for acceptance of responsibility.

[2] At the time, Ms. Monreal was twenty-four years old; sixteen-years younger than Defendant.

[3] The McKinley Residence is a trailer home.

bullet. The same day, Special Agent Fankhauser took photographs of the scene, which show a small hole in the floor of the home surrounded by fresh particles of floorboard.

Special Agent Fankhauser explained that Ms. Monreal's mother, fourteen-year-old sister, eleven-year-old cousin, and ten-year-old brother were inside the residence when Defendant fired his gun. Defendant forced Ms. Monreal into his Suburban, and drove her to Canutillo, Texas to a trailer where Defendant's brother, Sergio Ayala, and girlfriend, Crystal Ludwig, were staying (the "Canutillo Residence"). Defendant then sexually assaulted Ms. Monreal throughout the night of October 23, 2015.

Early in the morning of October 24, 2015, FBI agents went to the home of Defendant's aunt, Juana Ayala, in an attempt to locate Defendant and Ms. Monreal. Ms. Ayala agreed to assist law enforcement by calling Defendant's cell phone. Ms. Monreal spoke with Ms. Ayala from Defendant's phone and told Ms. Ayala that she was not in danger, and that she did not wish to speak with the FBI because she was worried about her immigration status[4]. At the hearing, Ms. Ayala explained that when she asked Ms. Monreal if Defendant had kidnapped her, Ms. Monreal started laughing and said that he had not.

Defendant called Ms. Ludwig to testify as to her memory of the night of October 23, 2015 and early morning hours of October 24, 2015. Ms. Ludwig testified that she and her boyfriend Mr. Ayala were in the yard of the Canutillo Residence when Ms. Monreal and Defendant arrived, and Ms. Monreal did not appear to be in any danger or to be there involuntarily. Later that night, Defendant and Ms. Monreal left together in the Suburban to pick up McDonald's and the four of them ate together. FBI agents contacted Ms. Ludwig early in the morning on October 24, 2015, and she agreed to go check on Ms. Monreal after learning agents

---

[4] Although Ms. Monreal did not testify at the evidentiary hearing, there was witness testimony that Ms. Monreal was in the United States illegally.

3

were looking for Defendant. When Ms. Ludwig checked on Ms. Monreal in the trailer, Ms. Monreal stated she was fine and again stated she did not want to speak with law enforcement. Ms. Ludwig admitted that she was not actually inside the trailer with Defendant and Ms. Monreal.

Later that morning, Defendant and Ms. Monreal left the Canutillo Residence. Defendant told Ms. Monreal to take his Suburban to Ms. Ayala's house because he knew his aunt was looking for him. Ms. Monreal left the Canutillo Residence in the Suburban, without Defendant. She did not drive to Ms. Ayala's house but instead went back to her mother's residence. Ms. Avalos called the police. Ms. Monreal first reported that she had not been in danger and that she had left with Defendant voluntarily. Ms. Monreal did not initially wish to speak with Special Agent Fankhauser. However, Special Agent Fankhauser testified that Ms. Monreal appeared fragile and frightened, was crying, and had visible bruising. He testified that she appeared to be withholding information, which is why he and other officers continued to press her with questions. At the hearing, Defendant called Deputy Sheriff Freddy Garcia of the Dona Ana County Sheriff's Office, one of the officers who initially investigated the incident, and Deputy Garcia testified that Ms. Monreal first told officers she was fine and that nothing had happened between her and the Defendant. However, Deputy Garcia also explained that Ms. Monreal appeared to be very frightened and was visibly upset and crying as she was speaking to him. She eventually revealed that the night before she had been taken from her mother's home against her will, and she did not feel that she was free to leave. After she admitted that Defendant had taken her, she said that she was not going to tell officers anything else because he had told her that if she let them know where he was, or what happened, that he was going to kill her or her mother.

Special Agent Fankhauser testified that upon further questioning by a female officer, Ms. Monreal began to discuss the incident in further detail. She elaborated that she previously said she was not in danger because she was scared, she had been in Defendant's presence when making those statements, and Defendant was still armed with his gun. Ms. Monreal also reiterated her concerns with her immigration status.

Ms. Avalos provided a statement to Dona Ana County Detective Alfred Sanchez on October 24, 2015. Ms. Avalos' account of the incident was consistent with what Agent Fankhauser learned from Ms. Monreal. Ms. Avalos explained that after Defendant and Ms. Monreal got into the Suburban, Defendant drove about ten feet, stopped the car, returned to Ms. Avalos, and told her that he would "come back" and that "when they mess with me, nobody remains alive." He then accelerated the vehicle and left.

Special Agent Fankhauser further testified that Defendant had previously threatened violence to Ms. Monreal and her family. Ms. Monreal told Special Agent Fankhauser that she had seen Defendant with a gun several times before the October 23 incident. Additionally, many of the witnesses Special Agent Fankhauser spoke with reported that Defendant was often seen with a gun, and these witnesses appeared frightened to relay this information out of fear Defendant would find out. Special Agent Fankhauser explained that nearly every witness he spoke with throughout the course of his investigation was afraid of Defendant, who has a reputation in the Anthony, New Mexico community as a violent and retributive individual.

On October 24, 2015, Ms. Monreal's family transported her to La Casa, which is a domestic violence shelter located in Las Cruces, New Mexico. Then, on October 27, 2015, Ms. Monreal sought treatment at La Piñon located in Las Cruces, New Mexico, which provides services to victims of domestic and sexual assault. Ms. Monreal was treated by Ashley Sveum,

5

RN, who testified at the hearing on June 5, 2017. Nurse Sveum has been a Sexual Assault Nurse Examiner ("SANE")[5] for approximately four years. Ms. Monreal told Nurse Sveum that she left her mother's home with Defendant because she was afraid he would hurt her mother. Once she and Defendant arrived at the Canutillo Residence, Defendant pulled her hair and kicked and punched her in her back and neck, and forced her to engage in oral sex. He spat on her face and she began to cry. He forced her to engage in various sexual acts throughout the night, and while it was happening, she was "praying for it to stop."

Nurse Sveum provided a SANE exam, which is a comprehensive exam available for a victim of a sexual assault and includes forensic evidence collection. Nurse Sveum stated that Ms. Monreal was calm and lucid and was not under the influence of any drugs or alcohol. Nurse Sveum documented nineteen bruises on Ms. Monreal's body, including on her neck, arms, breast, thighs, and buttocks. Nurse Sveum determined that the bruises on Ms. Monreal's arms and neck were consistent with being grabbed forcefully and strangled as Ms. Monreal had described.

Next, Nurse Sveum testified that Ms. Monreal had an abrasion on her vagina, which indicated she had been forced to engage in sexual intercourse. In fact, Nurse Sveum explained that she had rarely seen such type of vaginal lacerations on her patients, even after forcible sexual assaults. Nurse Sveum applied a type of dye called toluidine blue to the laceration. She explained that toluidine blue adheres to the skin only if there is in fact a laceration. The toluidine blue remained on Ms. Monreal's skin, showing a laceration consistent with the assault Ms. Monreal described.

---

[5] In addition to her general nursing background, Nurse Sveum completed 64 hours of additional didactic training and 20 hours of clinical training to become a SANE provider. Before her position as a SANE nurse, she was a certified nurse assistant for about five years. Nurse Sveum has extensive experience as a SANE nurse.

Defendant paints a different picture of what transpired from October 23 to October 24, 2015. While Defendant did not testify, his counsel presented evidence and argument that he contends support his position that Ms. Monreal left her residence willingly, and that the two later engaged in consensual sexual intercourse. Defendant called a number of witnesses to testify to this effect, primarily close family members and friends. Those witnesses also confirmed that Ms. Monreal was addicted to methamphetamine and that she injected methamphetamine intravenously. At the hearing, the Defendant attempted to illustrate Ms. Monreal as a heavy drinker and partier by introducing numerous photos from Ms. Monreal's Facebook account, which depict her drinking alcohol and gesturing with gang symbols.

Defendant also introduced a surveillance video of the McDonald's drive-through from the night of October 23, 2015 to show that Ms. Monreal was not in any danger. The video shows two individuals in the front seat of Defendant's maroon Suburban, but the Court notes it is difficult to discern what is going on inside of the Suburban, though neither passenger appears to be in any danger.

Finally, Defendant called the owner of the Canutillo property, Ron Tollman, to testify as to his memory of the October 23–24, 2015 events. Mr. Tollman explained that he allowed Mr. Ayala and Ms. Ludwig to stay in the trailer from time to time. He was asleep in the main house on the property adjacent to the trailer when Ms. Monreal and Defendant arrived on October 23, but he saw them the next morning when they woke up around 10:00. Mr. Tollman testified that Ms. Monreal was laughing and joking, and had no visible bruises. She and Defendant were acting like a couple and they took a shower together in Mr. Tollman's property. He heard Defendant tell Ms. Monreal that the police were looking for them, and that she should take his Suburban and return to Anthony, New Mexico to meet with them to resolve the situation. Mr.

7

Tollman then saw Ms. Monreal leave the Canutillo Residence in Defendant's Suburban, without Defendant. Mr. Tollman did not believe Ms. Morneal was in any danger or being held against her will because Defendant allowed her to take his vehicle and because the two were behaving "lovey dovey."

The PSR notes, and the parties do not disagree, that Defendant is a documented member of the Barrio Azteca gang. Special Agent Fankhauser explained that the Barrio Azteca is one of the most violent prison and street gangs in the country. The gang arose out of Juarez and primarily operates in El Paso, Texas and southern New Mexico. To become a member of the Barrio Aztecas, one must commit a crime of violence or engage in narcotics sales.[6]

Ultimately, the PSR assessed a criminal history score of seven for Defendant's three prior felony convictions and one misdemeanor conviction, all under state law. The first felony conviction was for Possession with Intent to Distribute Less than 50 Kilograms of Marijuana, a D Level drug offense committed when Defendant was 18 years old. The second was for Conspiracy and Possession with Intent to Distribute less than 50 Kilograms of Marijuana, also a D Level drug offense committed when Defendant was 21 years old. The final felony conviction for Defendant was for Aggravated Battery and Conspiracy to Commit Aggravated Battery and Bribery of a Witness committed when Defendant was 24 years old. Defendant initially received a suspended sentence of 6 years of probation for the case, but then had his probation revoked in 2004 and had a 4-year habitual offender enhancement attached to each count, so he ended up serving a lengthy prison term in state custody. The other conviction on Defendant's record is a misdemeanor conviction for Criminal Damage to Property when Defendant was 38 years old. The victim was Defendant's ex-wife.

---

[6] There was testimony elicited by defense counsel that Defendant was not in good standing with the Barrio Azteca gang, but Defendant's standing with the gang is not relevant to the variance matter.

In addition to these convictions, the PSR discloses records of two prior arrests that did not lead to convictions, including one for attempted murder from a February 20, 1994 incident where Defendant and other individuals fired several shots into the victim's vehicle.

## LEGAL STANDARD

After *United States v. Booker*, 543 U.S. 220 (2005), district courts are no longer required to sentence defendants within the prescribed Guidelines range. However, a district judge must still begin all sentencing proceedings by correctly calculating the applicable Guidelines range. *Gall v. United States*, 552 U.S. 38, 49 (2007). "Accordingly, although the 'Guidelines should be the starting point and the initial benchmark,' district courts may impose sentences within statutory limits based on appropriate consideration of all of the factors listed in [18 U.S.C.] § 3553(a), subject to appellate review for 'reasonableness.'" *Pepper v. United States*, 562 U.S. 476, 490 (2011) (quoting *Gall*, 552 U.S. at 49–51) (alteration added).

Any sentence the district court chooses to impose—whether it is within the Guidelines range or not—must comport with the goals of sentencing as set forth in 18 U.S.C. § 3553(a). An appropriate sentence will: (a) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; (b) afford adequate deterrence for criminal conduct; (c) protect the public from further crimes of the defendant; and (d) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Furthermore, in determining whether a Guidelines sentence adequately serves these goals, the court should consider the following factors: "(1) offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, . . . (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7)

the need for restitution." *Rita v. United States*, 551 U.S. 338 347–48 (2007) (quoting 18 U.S.C. § 3553(a)(1–7)). Finally, in all cases, the court must impose a sentence sufficient, but not greater than necessary to comply with the goals of sentencing. 18 U.S.C. § 3553(a).

"[W]e stress that sentencing courts 'should engage in a holistic inquiry of the § 3553(a) factors.'" *United States v. Lente*, 759 F.3d 1149, 1174 (10th Cir. 2014) (quoting *Lopez–Macias,* 661 F.3d at 492). "A district court must consider the extent of the deviation [from the Guidelines] and ensure that the justification is sufficiently compelling to support the degree of the variance. A major variance should have a more significant justification than a minor one. Nevertheless, the Court has rejected an appellate rule that requires extraordinary circumstances to justify a sentence outside the Guidelines range and the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Lente*, 759 F.3d at 1158 (internal citation and quotation marks omitted) (alternation in original).

"[I]t [is] quite clear that the sentencing court is not required to consider individually each factor listed in § 3553(a) before issuing a sentence. Moreover, [the Tenth Circuit] does not demand that the district court recite any magic words to show that it fulfilled its responsibility to be mindful of the factors that Congress has instructed it to consider." *United States v. Rines*, 419 F.3d 1104, 1107 (10th Cir. 2005) (quoting *United States v. Contreras–Martinez*, 409 F.3d 1236, 1242 (10th Cir. 2005)) (alteration in original).

## DISCUSSION

The Court finds Defendant's character and background—specifically his extensive and serious involvement in violent criminal activity, as evidenced by his prior convictions, prior arrests, and the disturbing circumstances surrounding the instant offense—at minimum warrant a

sentence on the high end of the sentencing guidelines range.. *See* 18 U.S.C. § 3553(a)(1)–(2). Moreover, the circumstances surrounding this offense necessitate a higher sentence in order to adequately reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). The Court further finds that a sentence above the high end of the guidelines range is sufficient, but not greater than necessary to comply with the purposes set forth in § 3553(a). The government has established by a preponderance of the evidence that on October 23, 2015, Defendant went to the McKinley Residence; shot a round from a firearm into the floor of the residence; forced Ms. Monreal to leave with him; and sexually assaulted her.

The Tenth Circuit has held that "'no limitation' should be placed on 'the information concerning the background, character, and conduct of a person for the purpose of imposing an appropriate sentence.'" *United States v. Mateo*, 471 F.3d 1162, 1167 (10th Cir. 2006) (quoting *United States v. Magallanez*, 408 F.3d 672, 684 (10th Cir. 2005)) (internal modifications omitted). Special Agent Fankhauser testified at length and in considerable detail about what he learned from Ms. Monreal and other witnesses as well as from his firsthand investigation into the October 23–24, 2015 events. The Court finds Special Agent Fankhauser to be a very credible witness. Agent Fankhauser's thorough testimony was based on his personal observations of Ms. Monreal and on his years of professional experience investigating these types of crimes.[7] Moreover, Ms. Monreal's story was corroborated by her mother and her younger sister. The Court finds the government has established that Defendant pushed his way into the McKinley Residence and threatened Ms. Monreal and her mother. Defendant then shot one round into the

---

[7] Special Agent Fankhauser has special training in conducting witness interviews, interrogations, crime scene processing, and firearms tactics. Since his time in the Las Cruces FBI office he has primarily handled investigations regarding narcotics trafficking and violent crimes involving gangs and armed criminals.

11

floor near where Ms. Monreal's fourteen-year-old sister was standing. The Court finds Defendant showed reckless disregard for the safety of not only Ms. Monreal and her mother, but the three minor children that were inside the home at the time.

On cross-examination of Agent Fankhauser, defense counsel pointed out that although there was a small hole in the floor of the McKinley Residence, officers never located an expended shell casing, nor did they find an expended bullet. The area was searched visually and by using a metal detector and excavating the soil beneath the residence, but still neither the casing nor bullet were ever located. However, Agent Fankhauser explained that based on his extensive experience in law enforcement, the reason the bullet was never located was because it likely shattered into many pieces after it hit a steel beam, which made it impossible to locate an intact spent bullet or casing. Moreover, the photograph of the hole taken immediately after the incident shows it is more likely the bullet hole was fresh because it depicts a small hole in the floor surrounded by particles of the floor material. The Court thus concludes it is more likely than not that Defendant fired his gun into the floor of the Mckinley Residence.

Though the Court does not find Defendant kidnapped Ms. Monreal[8], the Court concludes he initially forced her to leave the McKinley Residence with him. In the past, Defendant had threatened Ms. Monreal and her mother, and Special Agent Fankhauser credibly testified that numerous witnesses were of the opinion that Defendant is violent and retributive. Indeed, Defendant became physically abusive to Ms. Monreal starting in August of 2015 and his abuse sent her to the hospital on October 8, 2015 with a broken shoulder. The Court concludes that in light of these facts it was reasonable for Ms. Monreal to feel she had no choice but to accompany Defendant into his Suburban.

---

[8] The Court does not find Defendant kidnapped Ms. Monreal because it is undisputed Ms. Monreal was driving around in Defendant's vehicle by herself, with Defendant's permission, on October 24, 2015. These circumstances would not support the elements of kidnapping. *See* NMSA 1978, § 30–4–1 to –4.

12

Furthermore, the government has also shown by a preponderance of the evidence that Defendant sexually assaulted Ms. Monreal. The Court finds Nurse Sveum to be a very reliable witness, and the Court credits her testimony. She testified in great detail regarding the injuries and bruises she observed on Ms. Monreal's body, and concluded the injuries were consistent with a violent sexual assault. Nurse Sveum explained that in her years as a SANE nurse, she had rarely seen vaginal lacerations similar to the injury Ms. Monreal presented with, even in patients reporting violent rapes. Defendant argued the wound could have been explained by "aggressive" consensual sexual intercourse, but Nurse Sveum stated this would be highly unlikely because she would rarely observe such a wound even on a rape victim. Nurse Sveum found Ms. Monreal's vaginal abrasion to be consistent with the violent sexual assault that she described. Moreover, Nurse Sveum testified at considerable length regarding the bruises she documented from Ms. Monreal's neck to her thighs and concluded the bruises were consistent with the assault.

On cross examination, defense counsel pointed out that some of Ms. Monreal's bruises were accompanied by puncture wounds, and many intravenous drug users develop bruising around the needle injection site. Defendant contends that because Ms. Monreal used methamphetamines intravenously, her bruises could also be explained by drug use rather than abuse by the Defendant. However, Nurse Sveum explained that it is common for victims of sexual assault to abuse either drugs or alcohol. The Court agrees with the government that while some bruises and puncture marks support drug usage, they do not override the extensive evidence that Ms. Monreal presented with bruises and injuries that were consistent with Defendant violently sexually assaulting, i.e. raping, Ms. Monreal. In other words, that Ms. Monreal was a methamphetamine user does not preclude the possibility that she was also the victim of a violent sexual assault. The two are not mutually exclusive.

Nurse Sveum also credibly explained why Ms. Monreal did not have any wounds or bruises on her face and scalp despite her account that Defendant hit her and pulled her hair. Nurse Sveum clarified that in her experience, a person may be hit or kicked and will not always develop a bruise in that location.

Defendant argues Ms. Monreal's allegations about the sexual assault did not surface until two days after her arrival at the La Casa shelter, which must mean she was told she could obtain a U visa, which provides immigration status to domestic abuse victims who help law enforcement investigate a crime. The Court finds Defense counsel's assertions regarding Ms. Monreal being promised immigration status in exchange for her cooperation are pure speculation. There is absolutely no evidence in the record about the counseling La Casa provides to its patients regarding immigration status. In fact, Special Agent Fankhauser emphatically testified that Ms. Monreal was never offered legal status in exchange for her cooperation in his investigation.

Next, Defendant argued at the hearing that Ms. Monreal's version of the October 23, 2015 incident should not be credited because she told Ms. Ayala and Ms. Ludwig[9] that she was not in danger. However, each time Ms. Monreal made statements to the effect that she was not in danger, she was in Defendant's presence, who had just threatened to kill her and was still armed with his gun. Moreover, Special Agent Fankhauser explained that when Ms. Ludwig checked on Ms. Monreal at the Canutillo Residence, Ms. Monreal wanted to leave with Ms. Ludwig but she did not feel that Defendant would allow her to go.[10] Ms. Monreal was

---

[9] The Court has concerns regarding Ms. Ludwig's credibility. At the hearing, she admitted that she may have been using methamphetamines during the timeframe that she observed Ms. Monreal and Defendant at the Canutillo Residence.

[10] These facts were introduced at the hearing through Special Agent Fankhauser who was reading from the transcript of Ms. Monreal's FBI interview from October 29, 2015 that was conducted by Special Agent Ida D'Antonio-Hagan.

essentially too afraid of Defendant to feel that she could leave.  The Court agrees with the government that Ms. Monreal's resistance to tell Ms. Ayala and Ms. Ludwig what had happened and to speak with law enforcement could be expected given Defendant's prior threats and the sexual assault, and given Ms. Monreal's immigration status.

Furthermore, Defendant argues, Mr. Tollman saw Ms. Monreal the morning after the assault and he stated that she was unharmed and appeared to be happy, and there was no indication she and the Defendant were fighting.  The Court finds Mr. Tollman was a credible witness, but he admitted he was asleep during the timeframe when the sexual assault took place and that he has no idea what happened on the evening of October 23 until the next morning.  And although he stated that he saw Defendant and Ms. Monreal and she appeared happy and uninjured, this does not necessarily mean the violence and sexual assault did not take place the night before.  Moreover, although Mr. Tollman did not observe bruises on Ms. Monreal, her bruises were on her arms, breast, neck, and thighs, so it makes sense that Mr. Tollman may not have seen them.  Finally, the Court notes that it is not unusual for victims of domestic violence, the vast majority of whom are women in abusive relationships,  to take a considerable amount of time  to muster the courage to leave the perpetrator, and it is common for many women initially to deny that any abuse occurred.  In this case, although there appears to be a discrepancy between the violent sexual assault and the way Ms. Monreal was behaving in front of Ms. Ludwig and Mr. Tollman, the Court concludes it is not impossible or even unreasonable to reconcile the two, given that Ms. Monreal and Defendant were in an abusive, volatile romantic relationship.  Given the significant weight of all the other evidence, particularly Special Agent Fankhauser's testimony and the SANE exam conducted by Nurse Sveum, the Court concludes it is more likely than not that Defendant physically abused and sexually assaulted Ms. Monreal.

Defendant also attempts to poke holes in Ms. Monreal's believability by introducing various photographs of her consuming alcohol and gesturing with gang symbols. The Court finds these photographs to be irrelevant for the purposes of Defendant's sentencing since Ms. Monreal is not the one being sentenced in this matter. Even in finding that Ms. Monreal was a drug user, and even if Ms. Monreal was a heavy drinker, these circumstances do not diminish the Court's finding that Defendant threatened her with violence, discharged his weapon, and sexually assaulted her. The Court's focus is on the Defendant's conduct, not on Ms. Monreal's lifestyle choices. Moreover, the photographs are from approximately one and a half years prior to the October 2015 event, so their probative value is minimal.

Defendant contends the government is improperly seeking to punish the Defendant for conduct that the government could not prove at trial, and that is not relevant conduct for the offense of felon in possession of a firearm. Defendant makes much of the fact that the government would not have been able to prove a kidnapping and a rape had occurred beyond a reasonable doubt. Yet, this is not the standard before the Court. *See United States v. O'Brien*, 130 S. Ct. 2169, 2174 (2010) ("Elements of a crime must be charged in an indictment and proved to a jury beyond a reasonable doubt. Sentencing factors, on the other hand, can be proved to a judge at sentencing by a preponderance of the evidence."). Moreover, the Supreme Court and Tenth Circuit have made it clear that a district court has wide discretion to consider all aspects of the criminal act at issue, and no limitation should be placed on the information concerning the character and conduct of a defendant for the purpose of imposing an appropriate sentence. *See Pepper*, 562 U.S. at 489–90; *Mateo*, 471 F.3d at 1167.

Defendant further argues this Court should presume a sentence within the Guidelines range is appropriate. Defendant cites *Rita* for this proposition, but *Rita* held that federal

appellate courts may apply a presumption of reasonableness to a district court sentence within the Guidelines. *See* 551 U.S. at 347. That is not the precise issue before the Court. As the government appropriately points out, the Court must make an individualized assessment in sentencing Defendant based on the facts presented and considering the applicable § 3553(a) factors. As outlined in the preceding sections, the Court has carefully considered all of the facts presented in light of those factors and concludes an upward variance is warranted.

Finally, Defendant maintains an upward variance is not warranted because Defendant's criminal history is already accounted for by his criminal history points. However, the Tenth Circuit has repeatedly "held that district courts have broad discretion to consider particular facts in fashioning a sentence under 18 U.S.C. § 3553(a), even when those facts are already accounted for in the advisory Guidelines range." *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1222 (10th Cir. 2008); *See also United States v. Jarvi*, 537 F.3d 1256, 1263 (10th Cir. 2008); *United States v. Huckins*, 529 F.3d 1312, 1319 (10th Cir. 2008).

The Court finds that a sentence above the high end of the sentencing guideline range will deter this type of conduct. *See* 18 U.S.C. § 3553(a)(2)(B). This Defendant has spent the past twenty-four years of his life engaged in various forms of crime, and the majority of his crimes involve violence. The Court has grave concerns that Defendant's frequent brushes with the law indicate a commitment to a criminal lifestyle, one that has not been deterred by his prior arrests and convictions. It is striking that Defendant was released from prison on July 13, 2015, yet he was arrested for the instant offense a mere five months later. Clearly, Defendant's sentences for prior felonies have not effectively deterred him from engaging in criminal activity. In addition to Defendant's numerous convictions, the sheer number of arrests shows that he has a tendency to involve himself in violent criminal behavior.

In closing, the Court also finds the government has established by a preponderance of the evidence that Defendant is a violent and retributive individual who often uses threats of physical violence, and the Court concludes that an upward variance to Defendant's sentence adequately protects the public from further crimes of this Defendant. *See* 18 U.S.C. § 3553(a)(2)(C).

**THEREFORE**, based on the findings and conclusions set forth in this Memorandum Opinion, the Court grants the United States' Motion for Upward Variance. The Court will provide notice of the sentencing hearing in this case and will entertain any final arguments of counsel, will hear from the Defendant if he wishes to speak and will impose a final sentence at some level above 71 months, the high end of Defendant's correctly calculated sentencing guideline range.

**SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE